452 A.2d 718

FRANKLIN TOWNSHIP and County of Fayette, Appellants,

v.

COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL RESOURCES, and Elwin Farms, Inc., Appellees.

No. 81–1–80.

Supreme Court of Pennsylvania.

Argued Sept. 23, 1982.

Decided Dec. 1, 1982.

1

Michael J. Macko, Sol., Franklin Tp., Connellsville, Philip T. Warman, Sol., Fayette County, Uniontown, for appellants.

Paul E. Walters, Chairman, Environmental Hearing Bd., Harrisburg, Howard J. Wein, Asst. Atty. Gen., Dept. of Environmental Resources, Pittsburgh, for appellees.

Robert J. Shostak, Bernard Chanin, Philadelphia, for Elwin Farms, Inc.

Thomas L. Wenger, John R. Fenstermacher, Wix, Wenger & Weidner, Harrisburg, amicus curiae for Pennsylvania State Ass'n of Tp. Sup'rs.

## OPINION

Before O'BRIEN, C.J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

LARSEN, Justice.

On May 2, 1980, the Commonwealth of Pennsylvania, Department of Environmental Resources (DER) issued a permit for solid waste disposal and/or processing facility (Permit No. 300728) to Elwins Farms, Incorporated. The permit pertains to a facility called Elwin Farms Industrial Residue Processing Site located in Franklin Township, Fayette County, Pennsylvania. The permit was issued pursuant to an application received by the DER on September 11, 1979. It allowed and authorized the permitee to "stabilize and dispose of (using the 'Stabatrol Process' as described in the approved Facility Design and Operations Plans) neutralized inorganic sludges/residues with a solids content of 12% or greater, by weight, which do not contain (1) organic solvents, (2) sodium salts of arsenate, borate, phosphate, iodate, and/or sulfides, (3) more than 1% oil and grease." The baneful deposits sanctioned by this license are acknowledged to be toxic wastes which perpetually retain their hazardous toxicity.

On May 30, 1980, a timely appeal from the issuance of the permit was filed with the Environmental Hearing Board (EHB) by Franklin Township and Fayette County. The appeal was based, inter alia, on the following: (a) that the DER failed to establish permanent disposal within thirty (30) days as a requirement of the permit; (b) that proper consideration was not accorded to the existence of a high pressure gas line which runs across the subject property; (c) that the applicant furnished false, misleading, and fraudulent information in its application for a permit; (d) that no provisions for accidental spillage of large quantities of waste were provided; (e) that no consideration was given to the problem of transportation of the waste materials to and from the site; (f) that neither the applicant nor the owner of the land possess the mineral rights creating the possibility

of future mining operations beneath the surface; (g) that there is no method to insure that unauthorized materials will not be deposited at the site; (h) that there are several springs and seeps on the property which could become contaminated; (i) that the "stabatrol process" is not an established proven method; (j) that the land on which the facility is. to be operated is not zoned for the activity proposed; (k) that the DER failed to notify the township and the county of the application for a permit and breached its duty to cooperate with the local government units in discharging its duties under the Solid Waste Management Act.[1]

On motion of the permitee, Elwin Farms, Inc., the EHB dismissed the appeal on the basis that the township and the county lack standing to challenge the permit's issue. The Commonwealth Court, relying on its opinions in *Susquehanna County v. Commonwealth of Pennsylvania, Department of Environmental Resources,* 58 Pa.Common. 381, 427 A.2d 1266 (1981) and *Strasburg Associates v. Newlin Township,* 52 Pa.Common. 514, 415 A.2d 1014 (1980), affirmed the Order of the EHB dismissing the appeal for lack of standing on the part of the appellants. Upon petition, we granted allocatur.

The question of standing is rooted in the notion that for a party to maintain a challenge to an official order or action, he must be aggrieved in that his rights have been invaded or infringed. This principle was thoroughly considered in *Wm. Penn Parking Garage v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975) where this court confirmed that to have standing, a party must (a) have a substantial interest in the subject-matter of the litigation; (b) the interest must be direct; and (c) the interest must be immediate and not a remote consequence.

In *Wm. Penn Parking Garage, supra,* 464 Pa. 191–192–193, 346 A.2d 269–280, 281, this Court stated:

" '[The party] must have a direct interest in the subject-matter of the particular litigation, otherwise he can have

1. "Pennsylvania Solid Waste Management Act", Act of 1968, July 31, P.L. 788, No. 241, § 6(2).

no standing to appeal. And not only must the party desiring to appeal have a direct interest in the particular question litigated, but his interest must be immediate and pecuniary, and not a remote consequence of the judgment. The interest must also be substantial'. *Keystone Raceway Corp. vs. State Harness Racing Commission,* 405 Pa. 1, 7–8, 173 A.2d 97, 100 (1961)."

"The core concept, of course, is that a person who is not adversely affected in any way by the matter he seeks to challenge is not 'aggrieved' thereby and has no standing to obtain a judicial resolution of his challenge. In particular, it is not sufficient for the person claiming to be "aggrieved" to assert the common interest of all citizens in procuring obedience to the law."

"It is the latter principle which lies behind the traditional formulation's requirement that the would-be "aggrieved" party must have an interest which is "pecuniary" and "substantial". Thus, for example, it is clear that some interests will suffice to confer standing even though they are neither pecuniary nor readily translatable into pecuniary terms."

On the federal level, where review of federal agency action is sought, the standing requirement has been broadened to include persons who can show "that the challenged action had caused them "injury in fact" and where the alleged injury was to an interest 'arguably within the zone of interests to be protected or regulated' by the statutes that the agency was claimed to have violated." *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Also see: *U.S. v. Students Challenging Regulating Agency Procedures,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

■ The appellants, Franklin Township and Fayette County are legal persons in the sense that they exist as legal entities possessed of rights and responsibilities including the right and sometimes the duty to seek judicial or other legal relief. However, a township and a county are more than abstract entities; each is also a place populated by people.

They can be identified by fixed and definable political and geographic boundaries. These boundaries encompass a certain natural existence—land, water, air, etc. collectively referred to as environment. Whatever affects the natural environment within the borders of a township or county affects the very township or county itself. Toxic wastes which are deposited in the land irrevocably alter the fundamental nature of the land which in turn irrevocably alter the physical nature of the municipality and county of which the land is a part. It is clear that when land is changed, a serious risk of change to all other components of the environment arises. Such changes and threat of changes ostensibly conflict with the obligations townships and counties have to nature and the quality of life. We believe that the interest of local government in protecting the environment, which is part of its physical existence, is "substantial" within the meaning of "substantial interest" as set forth in *Wm. Penn Parking Garage, supra.*[2] Aesthetic and environmental well-being are important aspects of the quality of life in our society,[3] and a key role of local government is to promote and protect life's quality for all of its inhabitants. Recent events are replete with ecological horrors that have damaged the environment and threatened plant, animal and human life. We need only be reminded of the "Love Canal" tragedy[4] and many like situations faced by communities and

2.  "The requirement of a "substantial" interest simply means that the individual's interest must have substance—there must be some discernible adverse effect to some interest other than the abstract interest of all citizens in having others comply with the law. The requirement that the interest be "pecuniary" which may once have had independent significance, no longer adds anything to the requirement of an interest having substance, as defined above." *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975).

3.  See: *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636; and *U.S. v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254.

4.  A national emergency was declared at the Love Canal area of Niagara Falls, New York in August, 1978 because toxic chemicals deposited in the ground decades earlier were surfacing. The State of New York purchased the homes of approximately 240 families whose

local governments across the country to recognize the substantial local concerns.

One of the most pressing public issues of the 1980's is the prudent establishment of waste treatment facilities and disposal sites. It is crucial that such sites be established in an efficient fashion, at a minimal cost to society, and within the framework of providing maximum protection of public health and property rights.[5] This laudable and imperative goal can best be accomplished through the combined efforts of the citizenry and government. Cooperation between and among all who have an "interest" in the environment is essential to achieve the aims of minimal cost and maximum protection.[6]

property adjoined the contaminated site and provided relocation services for them. ENV'T Reporter, August 11, 1978, Vol. 9, No. 15, p. 581.

In May, 1980, President Carter declared a state of emergency at Love Canal and over 700 families, who may have been exposed to the toxic wastes, were temporarily relocated. ENV'T Reporter, May 30, 1980, Vol. 11, No. 5, p. 139.

5. "At present, there are approximately 55,000 different chemical substances in commercial use in the United States. In 1980, the chemical industry's annual sales were $162 Billion—more than 5 percent of the gross national product."

"One of the perplexing problems of modern life is that sometimes, and under some condition, some of the chemical substances we depend on can produce unwanted effects. When people speak of "chemicals" many think in terms of synthetic organic chemicals. This view is too narrow to meet the demands of environmental toxicologists. All types of chemical substances may be considered as potentially toxic. These substances can be as diverse as metal ore tailings, solvents, corrosives, inorganic salts and various elemental substances such as lead or phosphorus. Even a substance found on anyone's dinner table—common salt ($NaCl$)—could have serious environmental results if released in quantity to a small pond. The change in salinity could kill the fresh water fish and plants" Council on Environmental Quality, Environmental Quality, 1981. The 12th Annual Report of the Council of Environmental Quality (Washington D.C.: U.S. Government Printing Office, 1981) p. 115.

6. This kind of cooperation between and among governments and governmental agencies is now a statutory requirement under the provisions of the Solid Waste Management Act, 1980, July 7, P.L. 380, No. 97 § 504, 35 P.S. 6018.504 which provides as follows:

"Applications for a permit shall be reviewed by the appropriate county, county planning agency or county health department

We have found that the interest of local government in the natural surroundings is not insubstantial. We shall now consider whether the "direct" and "immediate" requirements of standing are satisfied in this case. In *Wm. Penn Parking Garage, supra.,* we said: "The requirement that an interest be 'direct' simply means that the person claiming to be aggrieved must show causation of the harm to his interest by the matters of which he complains."

Changing the inherent character and quality of the environment by the introduction of toxic wastes into the land, amply provides local government units with an interest which is direct in every meaningful sense. The same considerations which led us to the conclusion that the interest of local government in its physical attributes is substantial, apply in the determination that the interest is also direct. As we have noted, among the responsibilities of local government is the protection and enhancement of the quality of life of its citizens.[7] Indeed, it is a constitutional charge

where they exist and the host municipality, and they may recommend to the department conditions upon, revisions to, or disapproval of the permit only if specific cause is identified. In such case the department shall be required to publish in the Pennsylvania Bulletin its justification for overriding the county's recommendations. If the department does not receive comments within 60 days, the county shall be deemed to have waived its rights to review.

7. Examples of some of the duties which are associated with this important responsibility can be found in "The County Code", 1955, Aug. 9, P.L. 323, § 2101, 16 P.S. § 2101; the "Local Health Administration Law", 1951, Aug. 24, P.L. 1304 § 1 *et seq.,* 16 P.S. § 12001 et seq., and "The Second Class Township Code", 1933, May 1, P.L. 103, 1947, July 10, P.L. 1481, § 1 *et seq.,* 53 P.S. § 65101, *et seq.*

The "County Code" provides: "The board of county commissioners may provide and annually appropriate from any moneys in the county treasury not otherwise appropriated such sum or sums as they deem necessary for the protection of the health, cleanliness, convenience, comfort and safety of the people of the county". The County Code, 1955, Aug. 9, P.L. 323 § 2101, 16 P.S. § 2101.

The legislative findings and purposes as promulgated in the "Local Health Administration Law" provides in pertinent part as follows: "The General Assembly of this Commonwealth has determined and hereby declares as a matter of legislative finding that:

(a) The protection and promotion of the health of the people in furtherance of human well-being, industrial and agricultural pro-

which must be respected by all levels of government in the Commonwealth.[8]

ductivity and the national security is one of the highest duties of the Commonwealth.

(b) This cardinal duty can be performed only when adequate local public health services are available to all people of the Commonwealth, when these services are maintained at a high level of professional and technical performance, and when they are administered according to units of population sufficiently large to enable full time modern health services to be provided on the most economical basis by local communities working in partnership with the Commonwealth." Local Health Administration Law, 1951, Aug. 24, P.L. 1304 § 1, 16 P.S. § 12001.

Among the duties of County Health Departments is the mandate that they "shall prevent or remove conditions which constitute a menace to public health;" Local Health Administration Law, *supra.* § 10, 16 P.S. § 12010.

Pursuant to the provision of "The Second Class Township Code", 1933, May 1, P.L. 103, 1947, July 10, P.L. 1481, 53 P.S. § 65101 *et. seq.* townships of the second class are, inter alia, charged with the following duties:

"To regulate or prohibit the dumping or otherwise depositing of ashes, garbage, rubbish and other refuse materials within the township. To prohibit accumulations of ashes, garbage, rubbish and other refuse materials upon private property . . ." As Amended, 1961, May 9, P.L. 194 § 1, 53 P.S. 65708.

To make such regulations, by ordinance, not inconsistent with state laws and regulations, as may be necessary for the promotion of the health, cleanliness, comfort and safety of the citizens of the township." 1933, May 1, P.L. 103, art. VII, § 702, cl. XXIX, added 1947, July 10, P.L. 1481 § 9, 53 P.S. 65729.

". . ., to establish and construct, singly or jointly with other municipalities, sewer and drainage systems in the township . . ." 1933, May 1, P.L. 103, art. VII, § 702, cl. XXX, added 1947, July 10, P.L. 1481, § 9, 53 P.S. 65730.

". . ., in order to promote the public health, safety, morals, and general welfare, to enact and enforce suitable ordinances to govern and regulate the construction, alteration, repairs, occupation, maintenance, sanitation, lighting, ventilation, water supply, toilet facilities, drainage, use and inspection of all buildings and housing or parts of buildings and housing constructed, erected, altered, designed, or used in whole or in part for human habitation, and of the sanitation and inspection of land appurtenant thereto. . . ." As amended 1963, July 31, P.L. 381. No. 203, § 1, 53 P.S. 65751.

8. "The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and

Under section 504 of the "Solid Waste Management Act", 1980, July 7, P.L. 380, No. 97 § 504, 35 P.S. 6018.504, consultation and cooperation with local governing bodies is required.[9] If the DER neglected to comply with this requirement and failed or refused to afford the local governments an opportunity to review an application for a permit, it seems clear that, under such circumstances, the propriety of a challenge by the local government units could not be denied. We are aware that this provision of the current statute calling for cooperation is a recent enactment and was not a part of the prior law [10] in effect at the time of the issuance of the permit to Elwin Farms, Inc. Nonetheless, the cooperation mandated by the present Act is a statutory recognition of the ever-existing direct and substantial interest local governing bodies have in the character and quality of the environment.

The direct and substantial interest of local government in the environment, and in the quality of life of its citizenry cannot be characterized as remote. We need not wait until an ecological emergency arises in order to find that the interest of the municipality and county faced with such a disaster is immediate.

When a toxic waste disposal site is established, undoubtedly there is an instantaneous change in the land on which it is located, and an immediate risk to the surrounding environment and quality of life. These critical matters must be addressed by local government without delay. The environment which forms a part of the physical existence of the municipality or county has been altered and immediate attention must be given to the changed character if the local government is to properly discharge its duties and responsibilities. Furthermore, in the event of an environmental

maintain them for the benefit of all the people. Constitution of the Commonwealth of Pennsylvania, Art. I, § 27.

9. See Note 5, *supra.*

10. "Pennsylvania Solid Waste Management Act, 1908, July 31, P.L. 788, No. 241 § 1, *et. seq.,* 35 P.S. § 6001, *et seq.*

emergency, the local municipality and county would be the first line of containment and defense.

Franklin Township and Fayette County have a substantial, direct and immediate interest in the establishment and operation of a toxic waste landfill within its boundaries so as to give each standing to challenge the issuance of a permit.[11]

The Order of the Commonwealth Court is reversed and this case is remanded to the Environmental Hearing Board for proceedings consistent with this opinion.

ROBERTS, J., filed a concurring opinion in which O'BRIEN, C.J., joined.

HUTCHINSON, J., filed a concurring opinion.

NIX, J., filed a dissenting opinion.

ROBERTS, Justice, concurring.

I concur in the result.

Throughout the Solid Waste Management Act, Act of July 31, 1968, P.L. 788, 35 P.S. § 6001 et seq. (1968), there is evidenced an express legislative concern for the protection of the interests of local governments. Section 6002(1) declares that one of the main purposes of the Act is to "[e]stablish and maintain a cooperative state and local program of planning and technical and financial assistance for comprehensive solid waste management." To achieve this stated goal of cooperative regulation, section 6006(2) specifically obliges the Department of Environmental Resources to "[c]ooperate with appropriate Federal, State, interstate and local units of government . . . ," and section 6006(4) obliges the Department to "[d]evelop a Statewide solid waste management plan in cooperation with local governments . . . ." Pursuant to section 6006(5), the Department is also under a duty to "[p]rovide technical assistance to municipalities,

11. We would so hold even if the provisions of the "Solid Waste Management Act", 1980, July 7, P.L. 380, No. 97 § 504, 35 P.S. § 6018.504, which now require consultation and cooperation with local government units in the permit issuing process, had been adopted at the time of these proceedings.

counties, and authorities including the training of personnel." These provisions make it clear that appellants, Franklin Township and the County of Fayette, have a direct interest in the means chosen by the DER to manage the disposal of solid waste materials, including the decision to grant a permit for construction and operation of a disposal facility within their boundaries.

Apart from this direct interest in DER decision-making, appellants have alleged that the DER's issuance of the challenged permit will impair their interests in the environmental and economic condition of lands within their boundaries. This Court has recently held that the Administrative Agency Law, 2 Pa.C.S. § 501 et seq., permits a person "aggrieved" by agency action to seek review of that action, even though that person is not specifically afforded a right of review by the statute creating the agency, if the interest asserted is "arguably within the zone of interests sought to be protected or regulated by the statute or constitutional guarantee in question." *Application of El Rancho Grande, Inc.,* 496 Pa. 496, 505, 437 A.2d 1150, 1154, (1981), quoting *Wm. Penn Parking Garage v. City of Pittsburgh,* 464 Pa. 168, 198 n. 23, 346 A.2d 269, 284 n. 23 (1975) (plurality opinion). Accord, *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

Although the Solid Waste Management Act, Act of July 31, 1968, P.L. 788, 35 P.S. § 6001 et seq. (1968), contains no provisions setting forth specific criteria for the issuance of solid waste disposal permits by the DER, section 6007(e) of the Act expressly empowers the DER to revoke or suspend a permit whenever the Department determines that a solid waste processing or disposal facility "is creating a public nuisance, or . . . is creating a health hazard, or . . . adversely affects the environment or economic development of the area." 35 P.S. § 6007(e)(ii)–(iv). As this section makes clear, appellants' interests in preventing public nuisances and health hazards, as well as in preserving the economic value of private lands so that taxing revenues are not

reduced, are within the zone of interests sought to be protected or regulated by the Solid Waste Management Act.

Because appellants have a direct interest in the decision-making of the DER, and because appellants' interests in the environmental and economic condition of lands within their boundaries are within the zone of interests protected or regulated by the Act, it must be concluded that appellants have standing to challenge the issuance of the permit.

O'BRIEN, C.J., joins this concurring opinion.

HUTCHINSON, Justice, concurring.

I join the Majority Opinion and concur in its reasoning except I must disassociate myself from any inference in the Majority Opinion that article I, section 27 of our Constitution grants local governments, creatures of the sovereign, a right to enforce the duties that section imposes on the sovereign. Furthermore, I believe footnote eleven on p. 11, *supra* of the Majority Opinion in its reference to section 504 of the Solid Waste Management Act, 35 P.S. § 6018.504, is unnecessary *dictum.*

NIX, Justice, dissenting.

I dissent. The majority has misconstrued the central purpose of the Solid Waste Management Act, Act of July 31, 1968, P.L. 788, 35 P.S. § 6001, *et seq.,* (Act) in holding that appellants, Franklin Township and Fayette County, possess standing to challenge the Department of Environmental Resources' (DER) issuance of a permit for a solid waste disposal and/or processing facility to appellee, Elwin Farms, Inc.

The fact that appellants possess an interest in avoiding environmental pollution and economic loss as a result of potentially inadequate disposal of solid waste materials is not disputed. However, the legislature, in its passage of the Act, has clearly expressed a legislative judgment that protection of these environmental interests shall be vested primarily in the state, through DER.

The Act reflects the legislative policy to establish DER as the vehicle for overall supervision and ultimate control of the critical determination regarding when permits shall be granted, consistent with the public health and protection of the environment. The powers and duties of DER, as set forth in the Act, require the department to:

(1) Administer the solid waste management program pursuant to the provisions of this act.

(2) Cooperate with appropriate Federal, State, interstate and local units of government and with appropriate private organizations in carrying out its duties under this act.

(3) Adopt such rules, regulations, standards and procedures as shall be necessary to conserve the air, water and land resources of the Commonwealth, protect the public health, prevent public nuisances, and enable it to carry out the purposes and provisions of this act.

(4) Develop a Statewide solid waste management plan in cooperation with local governments, the Department of Community Affairs and the State Planning Board. When feasible, emphasis shall be given to area wide planning.

(5) Provide technical assistance to municipalities, counties and authorities including the training of personnel.

(6) Report to the legislature from time to time on further assistance that will be needed to administer the solid waste management program.

(7) Initiate, conduct and support research, demonstration projects, and investigations and coordinate all State agency research programs pertaining to solid waste management systems.

(8) Establish policies for effective solid waste management systems.

(9) Issue such permits and orders and conduct such inspections as may be necessary to implement the provisions of this act and the rules, regulations and standards adopted pursuant to the act.

\*    \*    \*    \*    \*    \*

35 P.S. § 6006.

Moreover, the legislature has specifically required DER to cooperate with local units of government in carrying out its duty to develop waste disposal plans beneficial to all the citizens of the Commonwealth. The cooperation between DER and local units of government mandated under the Act reflects the legislature's recognition of the concerns of these communities and establishes the parameters of their participation. However, conspicuously absent from the Act are any provisions enabling the local units of government to exercise potential vetoes over DER's judgment as to when issuance of permits furthers the statewide goal of environmental protection. The majority would rewrite the Act to enable local government units to intrude upon the ultimate authority vested in DER to establish a statewide solid waste management plan.

The legislature having statutorily defined the participation of local governments, the instant situation is unlike the one presented to this Court in *Application of El Rancho Grande, Inc.,* 496 Pa. 496, 437 A.2d 1150 (1981). In *El Rancho Grande,* this Court held that appellants, liquor licensees, had standing to challenge a determination of the Pennsylvania Liquor Control Board to grant a liquor license, notwithstanding the fact that appellants did not come within any of the sections of the Liquor Code, Act of April 12, 1951, P.L. 90, art. I, § 101 *et seq.,* as amended, 47 P.S. § 1–101 *et seq.,* which set forth specific classes of persons and institutions who may appeal from the Board's determination to grant or refuse a license. The underlying rationale for the grant of standing in *El Rancho Grande* was that without standing, appellants would have had no *input* in the decision-making process. However, in the instant case, the legislature has specifically provided (albeit not to the majority's satisfaction) for the input of appellants in its scheme. 35 P.S. § 6006(2) and (4). Therefore, the reasons for extending the traditional rules of standing which justified the result in *El Rancho Grande* do not exist here.

The legislature, in enacting the Solid Waste Management Act, sought to achieve a balance between the statewide

interests in developing an environmentally sound system of hazardous waste disposal and the localized interests of communities throughout the state. In providing for cooperation between DER and local government units, the legislature determined the respective roles of the various interests involved. Today's decision has upset that balance.