# Gorsline v. Board of Supervisors of Fairfield Township

C.P. of Lycoming County, No. 14-000130

*J. Michael Wiley* and *Joshua J. Cochrane,* for appellants.

*Kevin M. Walsh, Jr.,* for intervenors.

LOVECCHIO, *J.,* Aug. 29, 2014—Before the court is the appeal of Brian and Dawn Gorsline, and Paul and Michele Batkowski (appellants) to the decision of the board of Supervisors of Fairfield Township (Fairfield or the board), which granted a conditional use approval to Inflection Energy, LLC (Inflection) for the construction and use of an oil and gas well pad on property owned by Donald and Eleanor Shaheen and located in Fairfield Township.

Inflection filed a zoning and development permit application (application) to construct an oil and gas

well site on the Shaheen property. As described in its application, the proposed use of the property was as a site to "be used for the drilling, completion, production and operations of multiple gas wells." Public hearings on the application were held before the board on October 7, 2013 and November 4, 2013.

The well pad is proposed to measure approximately 300 feet by 350 feet initially and will ultimately measure 150 feet by 150 feet once completed. The well pad would be located on the Shaheen property which is located within a Residential Agricultural (RA) district. While there is only one residence that is located within a 1000 foot radius of the proposed well pad location, there is a large residential development, as well as many individual family homes located within a 3000 foot radius of the proposed well pad location.

On December 2, 2013, public action was taken by the board of Supervisors on the Conditional Use Application. In accordance with the provisions of 53 P.S. § 10908 (10), the board transmitted its final decision on December 18, 2013. On January 17, 2014, appellants filed a land use appeal from the written decision of the board. In their notice of appeal, appellants lodged numerous objections to the decision.

Arguments on the appeal and the issues raised therein were subsequently held before the court. The parties agreed that the court could hear and decide the appeal on the record without any further facts being presented. As well, the parties submitted written legal briefs in support of their respective positions.

In opposition to the appeal, Fairfield, Inflection and the Shaheens first argue that appellants have waived any right to raise the issues at this juncture because these issues were not raised before the board.

During the oral argument on this matter, Fairfield, Inflection and the Shaheens submitted that the appeal is governed by the Local Agency Law and in particular 2 Pa. C.S.A. § 753. Appellants disagreed and argued that their appeal is governed by the applicable provisions of Pennsylvania's Municipal Planning Code (MPC).

Conditional uses in Fairfield Township are governed by § 14.2 of the Fairfield Township Zoning Ordinance of 2007 ("ordinance"). The criteria for review and approval of a given conditional use are set forth in § 14.2.5 of the ordinance. The ordinance also establishes procedures for the application and mandates criteria that the board must consider in making a decision. In this matter and pursuant to § 14.2.6 of the ordinance, the board established findings of fact and issued a written decision within the prescribed time period after the last hearing. The board transmitted its written decision "in accordance with the provisions of 53 P.S. § 10908 (10)." Clearly, the board conducted the hearing and issued its decision pursuant to the MPC.

The appeal by appellants was styled as a "Land Use Notice of Appeal." Land use appeals are specifically addressed in the MPC. 53 P.S. § 11001-A.

The argument by Fairfield, Inflection and the Shaheens that the provisions of the Local Agency Law apply to the exclusion of the MPC lacks merit. The board issued its decision pursuant to the MPC and Inflection and the

Shaheens intervened in the appeal pursuant to the MPC. 53 P.S. § 11004 (A).

As appellants correctly note, the hearing and argument on the land use appeal is governed by the MPC and in particular 53 P.S. § 11005-A. That provision specifically notes that "[i]f the record below includes findings of fact made by the governing body, board or agency whose decision is brought up for review and the court does not take additional evidence, the findings of the governing body shall not be disturbed by the court if supported by substantial evidence." 53 P.S. § 11005-A.

Pursuant to 53 P.S. § 11006-A, in a land use appeal, "the court shall have the power to declare any ordinance or map invalid and set aside or modify any action, decision or order of the governing body...brought up on appeal."

There is no provision in the MPC that limits the court from addressing issues raised by appellants to only those issues that appellants raised before the board. Accordingly, the court dismisses the waiver argument of Fairfield, Inflection and the Shaheens.

Alternatively, even if the position of appellees and intervenors is deemed to have merit, the court agrees with appellants that the issues asserted by them in their appeal should be addressed for due cause shown. When the ordinance was adopted, it is safe to assume that neither the drafters, the municipality or the citizens contemplated the issues involved in oil and gas exploration. Moreover, and in light of the Supreme Court's decision in *Robinson Township v. Commonwealth*, 83 A.2d 901 (Pa. 2013), the issues raised by appellants have significant constitutional

import.

The first issue asaserted by appellants concerns whether Fairfield erred as a matter of law by reviewing the land use application as a "use provided for" under § 12.18 of the ordinance, rather than an application for "surface mining."

Unfortunately, § 12.18 of the ordinance is inartfully drafted and confusing in part. The court will endeavor to apply the ordinance and its required criteria consistent with its language and intent. The first criterion that the applicant must establish is that the proposed use is neither specifically permitted nor denied "under [the] ordinance." Clearly, the burden falls on Inflection to establish that its proposed use complies with the requirements of the ordinance. *Aldridge v. Jackson Township*, 983 A.2d 247, 253 (Pa. Commw. 2009).

Appellants argue that an oil and gas well pad and well drilling fall within the definition of surface mining which is permitted as a conditional use in the industrial district. They assert that the plain language of the ordinance provides that surface mining activities are authorized as a conditional use in the industrial district of Fairfield. Specifically, they further assert that the ordinance defines "surface mining" to include industrial surface activities aimed at extracting minerals from the ground and that the ordinance defines "minerals" to include "oil and natural gas." They contend that an interpretation of "surface mining" that does not include natural gas extraction within its meaning would render the term "minerals" and the phrase "oil and natural gas" meaningless and superfluous.

While the court sees some merit in this argument,

given the specific language of the ordinance and the legal precedents governing the interpretation of ordinances in general, the court cannot agree with appellant's position. Under the specific terms of the ordinance, the use proposed on the property is only permitted if it is not permitted in any other zone under the terms of the ordinance. Ordinance, § 12.18.2. Article 6 of the ordinance entitled "industrial district" permits as a conditional use "surface mining." Ordinance, § 6.2.3.12. Surface mining is defined in article 2. It includes the extraction of minerals from the earth but specifically does not include those mining operations carried out beneath the surface by means of shafts, tunnels, or other underground mine openings. Minerals are defined under article 2 as well. The definition of minerals includes "crude, oil and natural gas."

The court agrees with Fairfield and the intervenors that the language of the ordinance does not provide for Inflection's natural gas operations. It makes no mention of natural gas operations and said operations are not included in the definition of surface mining. As Fairfield and the intervenors assert, in order to qualify as surface mining, it is not enough to simply involve certain minerals. Instead, the ordinance requires the removal of the minerals in a certain fashion and specifically excludes subsurface mining.

Moreover, even if the language can be considered ambiguous, this court must give great weight and deference to the interpretation of it by Fairfield. *In Re: Thompson*, 896 A.2d 659, 669 (Pa. Commw. 2006); 1 Pa. C.S. § 1921 (c) (8). As intervenors correctly note in their brief, "The basis for the judicial deference is the knowledge and

expertise that a [municipality] possesses to interpret the ordinance that it is charged with administering." *In Re: Thompson, supra.*

As well, and also as Fairfield and the Intervenors correctly note, this court is required to interpret any ambiguous language in favor of the property owner and against any implied extension of the restriction. *City of Hope v. Sadsbury Township Zoning Hearing Board*, 890 A.2d 1137, 1143 (Pa. Commw. 2006). "In interpreting the language of zoning ordinances to determine the extent of the restriction upon the use of the property, the language shall be interpreted, where doubt exists as to the intended meaning of the language written and enacted by the governing body, in favor of the property owner and against any implied extension of the restriction." 53 P.S. § 10603.1. Accordingly, the court concludes that Fairfield did not commit an error of law in concluding that the proposed use was neither specifically permitted or denied in the zoning ordinance.

The second criteria the board must consider in addressing a conditional use are set forth in § 14.2 of the ordinance. The burden of proof with respect to these factors depends on whether the factors are deemed to be specific or general. *Bray v. Zoning Board of Adjustment*, 410 A.2d 909, 911 (Pa. Commw. 1980); *Appeal of Baker*, 339 A.2d 131 (Pa. Commw. 1975). In light of the court's decision below with respect to the remaining § 12.18 factors, the court need not address the § 14.2 factors.

As set forth in the December 18, 2013 opinion and order of Fairfield, it concluded that the proposed use "satisfies the requirements of the zoning ordinance

applicable to the proposed use in the RA-Residential Agricultural District." (Opinion and order, conclusions of law, Paragraph 8). Fairfield further found that the criteria for review as set forth in § 12.18 have been "sufficient (sic) satisfied." (Opinion and order; conclusions of law, paragraph 20). More specifically, Fairfield concluded that the site selected is generally appropriate for the proposed uses, and no evidence was offered that there would be any adverse impacts to the surrounding neighborhoods or negative impacts to adjoining properties that are not appropriately mitigated by the board's conditions to the conditional use approval. (Opinion and order, conclusions of law, paragraph 20). Curiously, other than a general finding by Fairfield that the criteria in § 12.8 have been satisfied, there are no specific findings regarding the required factors set forth in §§ 12.18.1, 12.18.2 or 12.18.3.

§ 12.18.1 establishes the third set of criteria. The use may only be permitted if the proposed use is similar to and compatible with other uses permitted in the zone where the subject property is located. The burden is on the applicant to prove such. *Aldridge*, 983 A.2d at 253.

This court must specifically determine whether there is substantial evidence to support a finding that Inflection demonstrated that its proposed use is similar to the other uses permitted in the zone where the subject property is located. Stated otherwise, the court must determine whether relevant evidence was presented to Fairfield such that a reasonable person might accept it "as adequate" to establish that the proposed use is similar to other uses "permitted in the zone."

The court concludes that with respect to the similarity

issue Fairfield abused its discretion in concluding that Inflection complied with its burden. Fairfield's decision is not supported by such relevant evidence that a reasonable mind might accept as adequate to support a conclusion.

First, and perhaps determinatively, the evidence presented as to the actual proposed use is not at all clear. The actual proposed use is fraught with significant uncertainties.

Inflection presented the testimony of both Thomas Irwin, a Senior Field Operations Manager for Inflection and Thomas Gillespie, the Director of Regulatory Affairs and Environmental Health and Safety at Inflection. While numerous specifics were set forth in connection with the proposed use, many determinative questions were left unanswered.

Inflection was unable to state with any certainty whatsoever, how many wells would be drilled. Transcript, 10/713, at 13 ("We will probably drill two wells off the pad initially, and it depends upon the results."). Inflection was unable to state with certainty how much water would be needed. *Id.* ("we like to start with a couple million gallons before we start the fracking operation."). Inflection was unable to state with certainty the type of energy it would be utilizing. *Id.* at 15 ("If we decide to use electricity ---. We will probably use solar, that is what we have been using on all our other sites. There is electricity to the location though if we need it."). Inflection was unable to state how long the site would be used for construction or otherwise. *Id.* at 26 ("We may come back...and so that makes it longer, a more drawn out process."). Inflection also could not say if after they drilled through the Marcellus shale, they would

be drilling other layers, thus being on the property much longer. *Id.*

With respect to adjoining property owners, Inflection could not state if the wells would be going under their property or "whose property it goes under." *Id.* at 35. With respect to a water source, Inflection could not confirm whether it would be supplied by pipeline or trucked in. *Id.* at 42-43.

No one testified that the proposed use is similar to other uses specifically permitted in the residential agriculture district. The permitted uses in a RA district are: Accessory Uses/Structures; Agriculture; Dwelling — Single Family Detached; Essential Services; Family Based Group Home; Family Day Care Home; Forestry Activities; Home Occupation; Hunting Camp or Seasonal Dwelling; and No Impact Home Based Business. Zoning Ordinance §4.2.1.

Fairfield argues in its brief that a natural gas pad is similar to the public service facilities that are permitted by conditional uses in the RA District. Such facilities include: power plants or substations; water treatment plants or pumping stations; sewage disposal or pumping plants and other similar public services, whether publicly or privately owned.

Appellants contend, and rightfully so, that Inflection's testimony was conclusory and not supported by any factual evidence whatsoever. Further, they persuasively argue that the uses permitted in the RA district do not involve the use of industrial machinery and chemicals, do not entail thousands of roundtrips of heavy truck traffic, do not cause loud noises at all hours of the day, do not

impose threats to human health and safety and do not have negative impacts on the environment.

Mr. Irwin testified that Inflection's proposed use was *not* classified as a public service facility under the ordinance. Transcript, 10/7/13, at **8**. Apparently dissatisfied with that answer, Inflection's attorney then asked the following leading question, "It fits the definition as a public service facility under the Fairfield Township Zoning Ordinance, it that correct?" After this prompting, Mr. Irwin said, "Yes." There was absolutely no explanation for Mr. Irwin's arguably inconsistent answers. The definition of a public service facility was not discussed or alluded to and no testimony was provided to show how Inflection's proposed use fits the definition. There was just a bald, conclusory statement that the use fit the definition of a public service facility.

Inflection also testified that it "received approval" for four other wells in the same zoning district. The court cannot conclude that this statement, in and of itself, constitutes such relevant evidence as a reasonable mind might accept as adequate to support the similarity conclusion. Inflection did not present any evidence whatsoever describing the specifics with respect to those other "four" wells. A resident, however, noted that the wells that have gone in seem to be much further from residential areas. Transcript, 11/4/2013, at 67. Furthermore, the criteria relates to similarity to explicit permitted uses, not other gas wells which are a use that is neither specifically permitted nor denied in the zoning ordinance. Moreover, Inflection is not constructing these gas wells to furnish natural gas to the residents of the Pines Development, or even Fairfield

Township.

There was also insufficient evidence to support the finding that Inflection met its burden of proving that the proposed use was compatible. The only testimony presented by Inflection on this issue was a statement by Mr. Irwin that he believes, given the location of the well, that it is compatible "with the surrounding properties." Transcript, 10/7/13, at 20. This conclusory statement falls far short of establishing that the proposed use is compatible. Being compatible with "other properties" also does not prove compatibility with "other uses" in the zoning district.

As well, numerous residents of Fairfield Township as well as other concerned individuals provided contrary proof. Their testimony raised specific issues regarding the compatibility of the subject property, the general purposes of the RA district and how the proposed use conflicted with those purposes and other uses permitted in the zone. Their concerns went beyond mere speculation, bald assertions, personal opinions or perceptions. Their concerns were factually based and supported by cogent arguments and evidence.

By way of example, numerous questions were raised regarding what, in fact, the limits were with respect to the proposed use. If the limits could not be explained by Inflection, the proposed use could not be deemed to be compatible with other uses. As well, the record is replete with testimony of individuals verifying the uses presently in existence in the zoning district and describing in detail how the proposed uses by Inflection would not be compatible.

The next factor to be considered is the general purposes factor set forth in 12.18.3. The proposed use may only be permitted if it "in no way is in conflict with the general purposes of [the] ordinance."

Appellants argue that the purpose of the RA district is to encourage development of a quiet, medium density, residential environment. *See* ordinance § 3.1. They argue further that unlike the uses permitted in the RA district, the Shaheen pad activities are clearly industrial related activities and uses.

Appellants note that the general purposes of the ordinance are to promote public health, safety and welfare; encourage the most appropriate use of land; conserve and stabilize the value of property; provide adequate open spaces for light and air; prevent undue concentration of population; and lessen congestion on streets and highways.

They argue that the testimony at the hearing established that the Shaheen pad poses the risk of spills, fires, accidents and other activities that threaten the public health, safety and welfare. Moreover, they argue that no testimony was offered to show that the Shaheen pad activities will conserve and stabilize the value of the residential properties or that traffic congestion would remain the same or lessen. Since traffic congestion, public health, safety and welfare, and property values are all general purposes of the ordinance, appellants argue that Fairfield could not properly conclude that the proposed use is in accordance with the ordinance purposes.

According to the clear language of article 3 of the ordinance, the RA district is generally intended for

application to rural development areas. The purpose of the regulations for this district is to foster a quiet, medium density residential environment while encouraging the continuation of agricultural activities and the preservation of prime farmland. Industrial uses are discouraged in this district. Compatible public and semipublic uses such as schools, churches and recreational facilities are provided for. As well, a higher density residential development may be permitted under certain circumstances. Ordinance, § 3.1.

As set forth in article 4 of the ordinance, the purpose of the RA district is to encourage the continued use of areas of the township for rural living including open space, agricultural and residential uses. Such uses typically do not require public utilities or community services. Uses which specify the provision of community or public utilities may be feasible in certain locations in the township provided that the developer is able to furnish the necessary utility infrastructure. Ordinance, § 4.1.

The only evidence presented by Inflection, in support of meeting its burden in connection with the general purposes factor was the testimony of Mr. Irwin. Mr. Irwin stated that he was familiar with the purpose of the RA zone and "believed" that the proposed use furthered that purpose as set forth in § 4.1 of the ordinance. Yet he failed to support his conclusion with any facts whatsoever. He failed as well to reference, let alone provide any facts, as to the purposes of the RA district as set forth in § 3.1 of the ordinance.

However, and in addition to the uncertainties relating to the actual use and activities, many facts were developed at

the hearing supporting the position that the proposed use is actually in conflict with the aforesaid general purposes.

During construction and drilling there would be an extreme amount of truck traffic. Mr. Irwin testified that "there will be a lot of trucks...I am guessing 1400, 1800 trucks just to get the gravel on location to meet the DEP permit we have applied for." Transcript, 10/7/13, at 18. There will be about 206 truck trips to bring the three drilling rigs onto and off of the property — three loads in and three loads out for the conductor rig, 40 loads in and 40 loads out for the top all rig, and 60 loads in and 60 loads out for the horizontal rig. *Id.* at 18-19. These figures did not include any trucks to get 2,000,000 gallons of water to the property. *Id.* at 13, 42-43. Inflection did not know how it was going to get the water to the property. It would take an additional 100 trucks to install a pipeline and if a pipeline did not go through it could be a very large number of trucks. *Id.* at 43. Mr. Irwin initially estimated the number of trucks to be 3000, but then he changed that number to 500 per well and stated that initially there would probably be two wells. *Id.* at 43-44. At the second hearing, however, Mr. Irwin stated that it would be 1430 trucks each with a trip in and out per well. Transcript, 11/4/13, at 61-62. The truck traffic would run 24 hours a day, nonstop except for two 45-minute shutdown periods. Transcript 10/7/13 at 44. Contrary to this clear evidence, the board found that (excluding water trucks) "total traffic is anticipated at 300 trucks during construction, 120 trucks during drilling and 225 during completion." Board opinion and order, finding of fact 31.

With respect to burning off excess gas, or what is

known as a flare or a controlled kick, Mr. Irwin could only state that Inflection did not "anticipate" doing it. *Id.* at 38. However, Inflection did not anticipate doing that with another well either. When they did, there were numerous noise complaints and Inflection shut down over the holidays. *Id.* at 50-51.

With respect to noise, Mr. Irwin's testimony was inconsistent. At one point he stated that "there might be a little noise" and "there is not very much, but if there is, [Inflection] tries to help the residents out." *Id.* at 21, 39. But if there is a lot, they put some hay bales around. *Id.* When a resident asked what the fracking was like compared to the seismic testing that shook her house and rattled her dishes, Mr. Irwin stated, "It's loud, and like I have said, we will try and take care of the neighbors." *Id.* at 65. When the resident indicated that her house was way up high, Mr. Irwin said, "I understand that. It is going to be hard to do that. But we will try and we have tried with all of our neighbors so far." Notably, however, when one of the residents asked how she or any of her neighbors would be compensated for the noise, trucks and everything else that goes on, Mr. Irwin replied "There is no compensation, I am sorry. There is just no compensation. We will try to work with you, and if there is noise we will try to keep the noise down." *Id.* at 48-49. Despite this testimony and there being no reference in the transcripts to any Lycoming County noise standards, the board found in finding of fact 35 that "applicant testified that any noise generated by applicant's operations would be below the Lycoming County noise standards."

With regard to how long this whole ordeal was going

to last, the application submitted by Inflection stated the drilling and completion stages would be for a period of 2-3 years. Intervenor's exhibit 6, at 2, 10. In response to questions from the residents, Mr. Irwin testified that that it would take at least 9 months, maybe longer. Transcript, 10/7/13, at 26, 32. Mr. Gillespie testified that the aggregate number of days with truck traffic would be 90 days, but the whole process takes about 4 months or so — three to four weeks of construction, a month to six weeks where there would be no trucks on the road, two to three weeks of actual well drilling, weeks later the fracking string comes in and they don't leave for another three weeks.[1] Transcript, 11/4/13, at 58-60. This, however, does not include any time for any post construction activities such as reduction of the well pad from 350' by 300' to 150' by 150'. *See*, Transcript, 10/7/13, at 12.

Curiously, when Mr. Minium, a resident who worked on a well pad in Susquehanna County, was commenting that life is going to "suck" for the next two years for anybody who lives around that pad and how it was going to be 24 hours a day, seven days a week and 365 days a year (Transcript, 11/4/13, at 45-48), the chairman of the board interrupted him and said that the "inconvenience" would be gone in 90 days. Transcript, 11/4/13/ at 48. Not surprisingly given the Chairman's comments, but contrary to the clear evidence of record, the board found that "applicant testified that the initial well pad construction and drilling process would take approximately three (3)

---

1. Inflection's attorney, Mr. Karpowich, suggested that the whole process would take 90 days. Transcript, 11/4/13 at 38. It is well settled, however, that arguments and statements of attorneys are not evidence. *Commonwealth v. LaCava*, 542 Pa. 160, 182, 666 A.2d 221, 231 (1995); Pa.SSJI (Civ.) 1.190.

months." *See* The board's opinion and order, finding of fact 34.

Of great concern to the court is the use of the term "no way" in the ordinance. Section 12.8.3 of the zoning ordinance states that the use may only be permitted if it "in no way is in conflict with the general purposes of this ordinance." The court defines "no way" as when there is a zero percent chance that something will or will not occur. There was insufficient evidence to conclude to a 100% certainty that the proposed use would not conflict with the general purposes of the ordinance.

The construction of anywhere from one or more well pads with potentially one to four wells on each well pad is clearly in conflict with the general purposes of the ordinance as set forth in the aforesaid sections. It is not an open space, agricultural or residential use, and it does not foster a quiet, medium density residential environment while encouraging the continuation of agricultural activities and the preservation of prime farm land.

The final factor addressed in 12.18 concerns detriment to public health, safety and welfare of the neighborhood where the well pad and wells are to be located. Ordinance, § 12.18.3. Regarding the applicable burden of proof with respect to this factor, appellants argue that pursuant to the express terms of the ordinance, the applicant, Inflection, bears the burden of proof.

A reading of the ordinance supports appellants' position. The ordinance reads as follows:

*"The burden of proof shall be upon the Applicant to demonstrate that the proposed use meets the foregoing*

*criteria and would not be detrimental to the public health, safety and welfare of the neighborhood where it is to be located."*

Appellants logically argue that the provision means what it says.

Appellee and intervenors argue on the contrary that despite said express language, case law retains the burden of production on the objectors. Remarkably, they are correct. While the ordinance places the "burden of proof" on the applicant as to the matter of detriment to health, safety and general welfare, "such a provision... merely places the persuasion burden on the applicant. The objectors still retain the initial presentation burden with respect to the general matter of detriment to health, safety and general welfare." *Manor Healthcare Corp. v. Lower Moreland Twp. Zoning Hearing Bd.*, 590 A.2d 65, 70 (Pa. Commw. 1991). The objectors must "raise specific issues concerning the proposal's general detrimental effect on the community before the applicant is required to persuade the factfinder that the intended use would not violate the health, safety and welfare of the community." *Id.* at 71, citing *Appeal of R.C. Maxwell Co., Id.* at 1303.

As with the other factors, appellants and the other objectors present at the hearing raised numerous and specific issues concerning the proposal's general detrimental effect on the community.

The court has already discussed the truck traffic, noise, and lighting. Such certainly is not consistent with the serene, pastoral setting of a RA district. It also will have a detrimental effect on the community. This area has rolling hills, a couple of streams and some wetlands. Transcript,

10/4/13, at 11-12. The proposed location of the well pad is below several of the resident's homes. By Mr. Irwin's own admission, this topography makes it more difficult to shield the residents from the noise and lights. Mr. Minium, who worked at a well pad in another county, testified that given the location of the well pad "down in that hole", the noise would echo up out away from the pad, and the lights would bring a glow so that nobody would be able to have a nice dark evening after Inflection starts drilling. Transcript, 11/4/13, at 45-47. Mr. Pentz also testified that with the trucks constantly running up and down Quaker State Road, the people wouldn't be able to sleep and the road would be all chewed up until Inflection was done. *Id.* at 45.

This is not the typical construction situation. It is common knowledge that when an individual hires contractors to build a house or a farm, the work typically is performed during daylight hours in the normal business week. In comparison, the construction and drilling for the proposed use involves constant or near constant truck traffic, illumination and noise from trying to get through thousands of feet (likely about a mile) of rock formations at all hours of the day and night, seven days a week until the well is completed. This would be less of a concern, and perhaps not a concern at all, in a commercial or industrial area where people aren't trying to sleep. In a commercial area, the businesses likely would be closed at night. In an industrial area, if there is a second or third shift operating, those industrial uses will have their own noise and light and won't notice or won't be bothered by the noise and light involved in the construction of a well pad. Here, however, there are in excess of 125 homes whose residents

likely will be adversely affected by Inflection's activities, especially the activities that occur during nighttime.

The residents also had concerns about the individuals who would be working near their homes. Mr. Irwin did not know if the numerous contractors working on the site required criminal background checks for its employees. Transcript, 10/7/13, at 78. Of the 400 people who would be working on the pad over the course of the project, 98 or 99% would not be Inflection employees. *Id.* Inflection's attorney stated, "We are hiring local, insured, licensed, respectable contractors." Transcript, 11/4/13, at 3. Later in the hearing a resident asked, "But do they have background checks?" *Id.* at 38. The attorney replied, "We don't know that." *Id.* When the resident indicated that she still had concerns, the attorney said "they do sign agreements that they're going to be law abiding and they're not going to commit any crimes." *Id.* at 39. Mr. Gillespie read a portion of an Inflection company policy into the record. The policy did state that there was a conduct policy that all Inflection's employees, contractors and other persons engaged in company business are obligated to follow, which prohibited, among other things, engaging in criminal conduct or any action that is detrimental to Inflection's efforts to operate properly and lawfully. The policy, however, did not state that contractors or their employees who had prior criminal records would not be hired. Instead, it merely stated that the company "inquires into the background of all of its employees, including contractors." *Id.* at 56. Unlike the standard of conduct policy relating to future activities, the inquiries into backgrounds did not explicitly cover "other persons engaged in company business" or describe what type of inquiry is made. In other words, Inflection

could hire company X to engage in construction activities such as hauling water, stone or concrete to the site and investigate company X, but not investigate the individuals actually driving the trucks onto the site or even know who those individuals are. The language quoted by Mr. Gillespie regarding background inquiries also could mean that Inflection just inquires about licensing, insurance and/or bonding (and not criminal background checks) as suggested by the statements of Inflection's attorney earlier in the hearing.

The residents raised concerns about radiation at both hearings. Inflection's testimony on this issue was again somewhat inconsistent. Mr. Gillespie testified that the radiation levels are checked because they are going down into a deep formation, a different formation than exists in the upper mile of the earth, and bringing drill cuttings of that deep formation up to the surface. Transcript, 11/4/13 at 22. "Because we are opening a hole up to something a mile down below the ground, everybody just wants to be sure you're not bringing something up or opening up a pathway for additional radiation to come out with natural rocks." *Id.* at 22-23. Mr. Gillespie downplayed the residents' concerns by stating they have never detected anything in this region that is out of the ordinary background levels we see and radiation is in just about all the water in the region, including the residents' drinking water. *Id.* at 31. When asked if he was saying the residents' drinking water had just as high level of radium 226 (a radioactive element) as a mile down, however, Mr. Gillespie said, "I wouldn't say that, but there is no correlation between the depths of water you are looking at and the amount of any element within it." *Id.* When a resident said he thought

there would be more radiation further down, Mr. Gillespie contradicted his earlier testimony and said, "The rock formations that are down there are related to and of the same system rock formations as the ones that are directly under your feet." *Id.*

The resident also cited a Duke University study which concluded that the waterways in Pennsylvania are now exceeding levels of appropriate radioactivity because of hydrofracking. Inflection, through both its attorney and Mr. Gillespie suggested that questions about the Duke University study challenged the process which is already permitted by DEP and went beyond what Mr. Gillespie was there to testify about. Inflection, however, did not refute the Duke study. Instead, Mr. Gillespie was "not ready to weigh in and say that the Duke people are right or wrong. It's not settled yet." Transcript, 11/4/13, at 36.

Stating that the process is already permitted by DEP begs the question. Merely because hydrofracking is regulated by DEP, certainly does not mean the activity should occur in this particular residential area. Inflection acknowledged that there are in excess of 125 wells that supply water to the residents within 3000 feet of Inflection's proposed well pad. Transcript 10/4/13, at 23-24. The residents were concerned that the increased levels of radioactivity in the waterways would also show up in their water supply and they were pointing to the Duke study to show that placing a natural gas well in this residential zoning district would be detrimental to their health, safety and welfare.

The residents were also concerned that the well casings would fail and affect their health, safety and welfare. Inflection could not say that no casings had ever failed in

502

the fracking process. It admitted that it was "very possible" that well casings "weren't installed properly in Lycoming County." Transcript, 11/4/13, at 29, 30. Inflection tried to downplay that by stating, "That is an installation, that's not a failure." The resident aptly replied, "Well the point is though installation or failure, it still could render someone's water undrinkable." *Id.* at 30.

In addressing the detriment question, Inflection merely stated that it "did not believe" that the proposed use would adversely affect the neighborhood or create any nuisance or hazards to people or pedestrians. Transcript, 10/7/13, at 20. A resident, however, noted that there is a blind hill coming out of the Pines Development. *Id.* at 39. Excessive truck traffic and a blind hill coming out of the development certainly could create a nuisance if not an actual hazard to people in the development.

Inflection cursorily stated that the proposed use would not have an adverse impact on health, safety or welfare of the public. *Id.* at 21. On additional questioning, Inflection could only respond "okay" when advised that there is no evidence to support its claim of no adverse impact. *Id.* at 32. Without any supporting evidence or "meat," Inflection stated that it would control the effects on health, safety and environment "at the site." *Id.* at 33.

Brian Gorsline testified about citations and violations. Particularly, Inflection was cited on July 18, 2013 by DEP for failure to properly control or dispose of industrial or residual waste to prevent pollution of the Commonwealth waters. Over a period of approximately five years, out of 180 wells inspected in Lycoming County, there were 660 violations. Transcript, 11/4/13 at 40, 41.

Given all of the aforesaid evidence, the court finds that the appellant objectors presented substantial evidence that there is a high degree of probability that the use will adversely affect the health, welfare and safety of the neighborhood. Therefore, they met their burden of production. The burden of persuasion, however, was not met by appellees and intervenors. In fact, there is no evidence to support the board's conclusion that said burden was met, let alone substantial evidence.

While the court appreciates the deference that the board presumably was paying to the intent and mandates of the legislature through Act 13 of 2012, the Pennsylvania Oil and Gas Act, such deference cannot be in abrogation to the criteria of the ordinance.

As the Pennsylvania Supreme Court recently noted, the technique used to recover the natural gas contained in Marcellus shale "inevitably" does "violence to the landscape." *Robinson Township v. Commonwealth*, 83 A.3d 901, 914 (Pa. 2014). One unconventional gas well uses several million gallons of water. *Id.* at 915. "The Commonwealth's experience of having the benefit of vast natural resources [with] unrestrained exploitation...[has] led to destructive and lasting consequences not only for the environment but also for the citizens' quality of life." *Id.* at 963. "By any responsible account, the exploitation of the Marcellus Shale Formation will produce a detrimental effect on the environment, on the people, their children and future generations...perhaps rivaling the environmental effects of coal extraction." *Id.* at 976.

Fairfield Township has a substantial and immediate interest in protecting the environment and the quality

of life within its borders. *Id.* at 919-920. This quality of life is a constitutional charge that must be respected by all levels of government. *Id.* at 952 (citing *Franklin Twp. v. Commonwealth*, 499 Pa. 162, 452 A.2d 718, 722 & n.8 (1982)). "When government acts, the action must, on balance, reasonably account for the environmental features of the affected locale." *Id.* at 953.

While the court understands the constraints that the board may have been operating under as a result of Act 13 and the litigation regarding its constitutionality, our Supreme Court has now ruled with respect to such, the citizens' rights cannot be ignored and must be protected. Neither the applicant nor the board explained how unconventional natural gas operations are compatible with the permitted uses in this residential district. Furthermore, the board's findings were not supported by substantial evidence and, in some instances, were clearly in contravention of the evidence.

Appellant has raised several other issues in its appeal. In light of this court's findings with respect to the factors set forth in § 12.18, the court sees no need to address the other issues. In fact, the court deems it improper to do so. The court should not and cannot address, for example, constitutional issues if they need not be addressed.

In conclusion, taking into account the respective burdens as well as the standard for this court's review, and acknowledging the appropriate deference that should be given to the board in connection with its decision, the court nonetheless concludes that the board's findings with respect to the § 12.18 factors are not supported by substantial evidence. Accordingly, the appeal of appellants

shall be granted and the decision and order of the board shall be vacated and set aside.

## ORDER

And now, this day of August 2014, for the reasons set forth herein, the appeal of appellants Gorsline and Batkowski is granted. The decision of the Fairfield Township Board of Supervisors issuing a conditional use permit to Inflection Engergy, LLC to construct and operate an unconventional natural gas well pad on the Shaheen property is vacated, set aside and reversed.